**DORSEY & WHITNEY LLP**
Zachary W. Carter, Esq.  (zc-0216)
250 Park Avenue
New York, NY  10177
Tel.:  212-415-9200

**DORSEY & WHITNEY LLP**
Roger J. Magnuson, Esq. (*pro hac vice*)
Thomas M. Jancik, Esq. *(pro hac vice)*
Suite 1500, 50 South Sixth Street
Minneapolis, MN  55402
Tel.:  612-340-2600

*Attorneys for Plaintiff*
*Envirokare Tech, Inc.*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

Envirokare Tech, Inc.,

                Plaintiff,                              No. 05 Civ. 5515 (LAK)

-v-

Steve Pappas,                    **SECOND AMENDED COMPLAINT**

                Defendant.

-------------------------------------------------X


For its Second Amended Complaint against Defendant Steve Pappas ("Pappas"), Plaintiff Envirokare Tech, Inc., ("Envirokare" or "the Company") states and alleges as follows:

**Parties, Jurisdiction and Venue**

1.     Plaintiff Envirokare is a Nevada corporation having its principal place of business at 5850 T.G. Lee Boulevard, Suite 535, Orlando, Florida.

2. Defendant Pappas is an individual residing at 44 87th Street, Brooklyn, New York, and a Director of Envirokare. Upon information and belief, Defendant Pappas is a citizen of the State of New York.

3. This is a claim for declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, which arises from an actual controversy between Envirokare and Pappas as to the validity of a voting trust under the common law.

4. This is also a claim for breach of fiduciary duty. Defendant Pappas is an officer of Envirokare. As an officer, he owed Envirokare fiduciary duties of loyalty, good faith, due care, and candor. Pappas breached these duties by using his position for his own personal benefit to the detriment of Envirokare and its shareholders.

5. This Court has subject matter jurisdiction over Envirokare's claim under 28 U.S.C. §§ 2201, and 1332(a).

6. Venue is proper in this district under 28 U.S.C. § 1391(a) because Pappas is subject to personal jurisdiction in this district.

**Factual Background**

7. Envirokare is a publicly held and traded Nevada corporation organized in 1998 as a developer and marketer of environmentally friendly recycled and recyclable products.

8. Envirokare's sole and only business is to commercialize TPF™, Thermoplastic Flowforming, a unique, patented and economically attractive process for producing large parts from low-cost, commodity thermoplastic polymers and reinforcing fibers such as glass, Kevlar, and carbon.

9. The TPF™ process was developed and patented by Thermoplastic Composite Designs, Inc. ("TCD"), a Florida corporation located in Mims, Florida. The inventor of the technology and co-founder of TCD is Dr. Dale Polk ("Dr. Polk").

10. In November 2000, Envirokare entered into a development agreement with TCD for the development of a heavy-duty, glass-fiber-reinforced rackable pallet.

11. On or about March 23, 2001, Envirokare and TCD entered into an irrevocable merger agreement, as well as a corresponding license agreement, regarding the TPF™ technology, to effectuate a merger of Envirokare and TCD. The original target date for the merger was September 30, 2003.

12. Under the terms of the merger agreement, TCD agreed to merge with Envirokare in exchange for consideration equal to the sum of $15,000,000.

13. In order to facilitate the merger, Envirokare Composite Corp. ("ECC") was created in March 2001 as a wholly-owned subsidiary of Envirokare. As the corporate parent, Envirokare was to acquire all rights to TCD's assets, including real property, equipment, and rights to the TPF™ technology through ECC.

14. On March 26, 2001, Pappas, having acquired a significant amount of Envirokare stock, became President of Envirokare. Under Pappas' leadership not only did the financial condition of Envirokare deteriorate but also his lack of managerial expertise was such that within a period of less than twelve months after taking office, Envirokare's relationship with Dr. Polk was almost completely destroyed and its ability to consummate the merger was placed in severe jeopardy.

15. Suffice it to say that during Pappas' tenure as the President, CEO, and Chairman of Envirokare, the Company failed: (1) to create any credible business plan; (2) to develop the production facility necessary to conduct product development work; and (3) to negotiate any contracts beneficial to Envirokare.

16. By January 2002, Pappas finally acknowledged his own inadequate leadership and managerial skills. He sought outside advice and assistance from the current President of

3

Envirokare, George Kazantzis ("Kazantzis"), with whom he had spoken in the summer of 2001, and engaged him to serve as Vice President in August 2002.

17.     Almost immediately after being engaged as Vice President, Kazantzis: (1) engaged professional counsel to review and do whatever was necessary to secure Envirokare's patent protection for the TPF™ technology, without which such patent protection would have been lost; (2) made every effort to develop anew a mutually beneficial trustworthy business relationship with Dr. Polk; and (3) started a personal search for a new Envirokare management team that would have the professional knowledge, backgrounds and expertise to develop and commercialize the TPF™ technology.

18.     As an officer of Envirokare, Pappas owed fiduciary duties to the Company and its shareholders.  Pappas was required to discharge his duties in good faith, in a manner he reasonably believed to be in the best interest of Envirokare, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.  These duties further required that Pappas act in the best interest of Envirokare and not in a manner that served his own personal interests at the expense of Envirokare and its shareholders.  Pappas violated these duties during his tenure as the President, CEO, and Chairman of Envirokare.

19.     During his tenure as the President, CEO, and Chairman of Envirokare, Pappas violated his fiduciary duties by, among other things: (1) arranging for the acquisition of Envirokare stock for himself, family members and friends on terms that were beneficial to Pappas and his associates and detrimental to the Company; (2) arranging for himself, family members and associates to make loans to the Company on terms that were detrimental to the Company and beneficial only to Pappas and his associates; (3) making false and misleading representations in order to convince the Company's new management team to acquiesce to certain financial transactions; (4) arranging for the grant of Company shares to friends and

4

associates without adequate consideration; and (5) submitting numerous requests for allegedly reimbursable expenses and Company cash without proper supporting documentation.

20.     While an officer of Envirokare, Pappas also engaged in self-dealing and violated his fiduciary duties by taking a series of actions in pursuit of the "Maine Transaction."  In order to facilitate the opening of a call center company, Pappas signed a Merchant Agreement and Addendum in the name of Envirokare.  This action was taken without the approval of the Board of Directors of Envirokare and without apparent authority regarding the transaction.  Pappas pursued this opportunity only for his own personal benefit and not for the benefit of Envirokare.

21.     As outlined below, when Pappas signed the Merchant Agreement and Addendum in the name of the Company, Pappas was bound by a Company resolution restricting him from entering into any contractual negotiations on behalf of the Company, without first providing a term sheet to the Board of Directors for consideration and receiving an explicit written consent from the Board.  Pappas neither provided a term sheet nor received explicit written consent from the Board of Directors to bind the Company in the context of the Maine Transaction.

22.     After the opening of the call center, an action was filed in Superior Court of Cumberland County, Maine, dated April 7, 2004 by an individual, Stephanie Dempsey, and 12 others against SportsQuest of New England, LLC ("SportsQuest"), Envirokare, Pappas, and others claiming back wages for work at the call center, which was operated by SportsQuest.

23.     As a result of Pappas' decision to implicate Envirokare in the Maine Transaction without the Company's knowledge or approval, Envirokare has been subject to exposure and legal fees related to the litigation pending in Cumberland County, Maine.

24.     Through his conduct during his tenure as the President, CEO, and Chairman of Envirokare, Pappas failed to act in good faith.  Pappas could not have reasonably believed that his conduct was in the best interests of Envirokare.

25.     On February 14, 2003, the Board of Directors of Envirokare appointed Kazantzis as President and interim CEO of the Company, effective March 5, 2003.  Kazantzis began to assemble a new management team comprised of Dr. Nick Pappas, Dr. Gary Cook, and Dr. John Verbicky.  Dr. Nick Pappas is not related to Defendant Pappas.

26.     On June 30, 2003, the Board of Directors of Envirokare approved Kazantzis to be the sole person to negotiate contracts on behalf of the Company.  The Board of Directors also approved a resolution requiring that "the express written consent of the Board" be obtained in order to negotiate and enter into contracts on behalf of Envirokare.

27.     By the summer of 2003, the relationship between Dr. Polk and Pappas had deteriorated to the point that it became difficult for Envirokare's new management team to assess TCD's operating facility for purposes of TPF™ technology evaluation for potential customers and partners.

28.     On August 7, 2003, Pappas executed the "Steve Pappas – Gerasimowicz Blind Trust Agreement" ("Trust Agreement") with Dr. Walter Gerasimowicz ("Dr. Gerasimowicz") as Trustee.  A true and correct copy of the Trust Agreement is attached as Exhibit A.

29.     Dr. Gerasimowicz is the CEO of Meditron Asset Management, L.L.C. ("Meditron"). On August 7, 2003, Pappas also executed an Investment Advisory Agreement with Meditron regarding the management of the Voting Trust that was created by the Trust Agreement.  A true and correct copy of the Investment Advisory Agreement is attached as Exhibit B.

30.     Under the terms of Trust Agreement, Pappas was required to deposit all of his shares of Envirokare stock into the Voting Trust.  Pappas deposited approximately 4,100,000 such shares.

31. Upon information and belief, since the creation of the Voting Trust, Pappas has acquired Envirokare stock in open market transactions and failed to place those shares into the Voting Trust, in violation of the terms of the Trust Agreement. In addition, upon information and belief, Pappas failed to place all of his Envirokare stock into the Voting Trust at the outset of the Trust, in violation of the terms of the Trust Agreement.

32. The Trust Agreement provides as follows: "The primary purpose of the Trust is to confer on the Trustee [Dr. Gerasimowicz] the sole responsibility to administer the trust and to manage trust assets without the participation by or the knowledge of any interested party." The Trust Agreement provides that the term "interested party" means Pappas, his spouse, or any minor or dependent child, or their representatives.

33. With respect to the termination of the Voting Trust, the Trust Agreement provides in relevant part as follows:

> (A) This Trust shall terminate upon the first to occur of the following: (1) at Three years from the date of this document; [or] (2) [Pappas'] death. The period between the date of this agreement and the termination of the Trust shall be called the "Trust Term."
>
> (B) Notwithstanding Paragraph (A) of this Article . . . this Trust agreement may in addition be terminated through revocation in the event that Envirokare does not give notice to TCD prior to the end of the term provided for such notice in the merger agreement as amended, of its intent to proceed with the merger with TCD as referenced above. However, such revocation or any amendment of the terms of this Trust agreement shall require the prior written approval of the Board of Directors of Enviokare [sic].

34. None of the termination-triggering events outlined in the Trust Agreement have occurred.

35. The Trust Agreement provides that the Board of Directors of Envirokare must provide written approval before a successor trustee can be designated and appointed. The Trust Agreement also provides that the Board of Directors of Envirokare must provide written

approval before any of the terms of the Trust Agreement are amended.  As a result, Envirokare is an express beneficiary of the Trust Agreement.

36. The Voting Trust was established by the Trust Agreement for four reasons:  (1) to make Dr. Polk feel secure and therefore willing to work with the new management team unaffected by the managerial incompetence of Pappas so as to help facilitate the merger with TCD; (2) to avoid any conflict of interest, or appearance of such conflict, which may arise from Pappas' role as a lender to Envirokare; (3) to avoid any conflict of interest, or appearance of such conflict, which may arise from Pappas' past conduct, including his roles in other businesses; and (4) to make it possible for Envirokare to attract and retain experienced industry management personnel.

37. During the fall of 2003, an initial meeting between Dr. Polk and the new management team was held.  During this meeting Dr. Polk indicated that he was no longer interested in working with Envirokare.  Dr. Polk stated that he was fed up with the unfulfilled and misleading promises made by Pappas, and that he wished to have his TPF™ technology returned to his full control by having the merger agreement between Envirokare and TCD lapse.  Dr. Polk also indicated that he was extremely disappointed that 2.5 years of pending patent life and competitive advantage had been lost under Pappas' leadership.

38. After these meetings, and in partial recognition of the Trust Agreement, Dr. Polk reluctantly agreed to grant the new management team access to the TCD facilities.

39. On or about September 28, 2003, Envirokare entered into amended agreements with TCD to extend the license and merger agreements executed in March 2001.  The amended agreements provide for an extension of the initial agreements to March 2005.  These agreements were negotiated by Envirokare's new management team.

8

40. On or about October 10, 2003, the Board of Directors of Envirokare appointed Dr. Nick Pappas as a Director and Executive Chairman of the Company. The Board of Directors also appointed Dr. Gary Cook, Dr. John Verbicky, and Dr. Gerasimowicz as Directors. Dr. John Verbicky was also elected President and CEO of the Company.

41. On March 3, 2005, Envirokare completed the merger with TCD. TCD agreed to merge with Envirokare in exchange for consideration equal to the sum of $15,000,000.

42. As a result of the merger, Envirokare acquired all rights to TCD assets, including real property, equipment, and rights to the TPF™ technology, through its wholly-owned subsidiary ECC.

43. On March 3, 2005, Envirokare, through its wholly-owned subsidiary ECC, also executed a Limited Liability Company Agreement with NOVA Chemicals, Inc. ("NOVA") creating LRM Industries, LLC ("LRM"), a joint venture company. LRM was created for the purpose of commercializing Envirokare's TPF™ technology.

44. Both ECC and NOVA own 50% of LRM. ECC contributed all TCD assets to LRM in exchange for its interest, while NOVA contributed $5,000,000 in cash, as well as $1,000,000 worth of services to the new company.

45. In the fifteen months since the arrival of the new management team at Envirokare, the Company has been brought from a dismal state to an amicable agreement with Dr. Polk and TCD, which resulted in the creation of a joint venture company, LRM, partnering with a strong industry player, NOVA.

46. The structure of and terms contained in these agreements are superior in most every respect to Envirokare's status and position at the time the new management team came to the Company. Envirokare may not have remained solvent without realizing the immediate cash and numerous additional long-term benefits emanating from the recently completed agreements.

47. Since arriving at Envirokare in 2003, the new management team has also developed a sophisticated Business Plan for the TPF™ technology. This Business Plan provided Envirokare with a presentation basis from which initial discussions with numerous prospective industry partners were achieved.

48. Since arriving at Envirokare in 2003, the new management team has also discovered that Pappas violated his fiduciary duties as described in Paragraphs 18-24 above.

49. On March 19, 2005, by and through his attorney, Pappas sent a letter to Dr. Gerasimowicz requesting that the Voting Trust and the Trust Agreement, together with the Investment Advisor Agreement, be formally terminated because the "material purposes for which the Trust was originally formed no longer exist." A true and correct copy of the letter is attached as Exhibit C.

50. Upon information and belief, the termination of the Voting Trust and the Trust Agreement would disrupt current business operations and hinder attempts to attract and retain experienced industry managers to guide Envirokare.

51. Upon information and belief, the termination of Voting Trust and the Trust Agreement would damage Envirokare's business reputation by virtue of Pappas' past misconduct and relationships to other businesses.

52. Upon information and belief, the termination of the Voting Trust and the Trust Agreement would create the appearance of conflict because of Pappas' status as a lender to Envirokare.

53. Upon information and belief, Pappas' request to terminate the Voting Trust and the Trust Agreement is nothing more than an unabashed attempt to retake control of Envirokare.

54. As a result of Pappas' contention that the material purposes for which the Voting Trust was originally formed no longer exist, there is an actual controversy between the parties as to whether the Voting Trust is valid and remains in effect.

## FIRST CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY OBLIGATIONS)

55. Envirokare incorporates herein by reference its allegations in Paragraphs 1 through 54 above.

56. Defendant Pappas was an officer of Envirokare. As an officer, Pappas owed Envirokare fiduciary duties.

57. As more fully described in paragraphs 18–24, Pappas' actions while an officer of Envirokare constitute a breach of his fiduciary obligations the Company.

58. Pappas' breaches of fiduciary duties were the actual and proximate cause of damages incurred by Envirokare in an amount in excess of $75,000. Pappas should have to forfeit and disgorge all compensation and other unjust benefits that he received during the period of breach. Pappas should also have to pay all the damages that he has caused to Envirokare.

## SECOND CLAIM FOR RELIEF
### (VALIDITY OF VOTING TRUST)

59. Envirokare incorporates herein by reference its allegations in Paragraphs 1 through 58 above.

60. None of the termination-triggering events outlined in the Trust Agreement have occurred.

61. The purposes of the Voting Trust have not been fulfilled or become illegal or impossible to fulfill.

62. There are no circumstances not known to or anticipated by Pappas that would substantially impair the accomplishment of the material purpose of the Voting Trust if the Voting Trust is complied with.

63. The material purposes for which the Voting Trust was formed continue to exist.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Envirokare prays:

1. That the Court order Pappas to disgorge all compensation and other benefits, including Envirokare stock, that he received during the period of breach.

2. That the Court declare that the Voting Trust and the Trust Agreement are valid and will remain in full force and effect until August 7, 2006.

3. That the Court impose any equitable relief deemed to be just and proper, including, but not limited to: (a) extending the Trust Agreement for a period of five years from its current date of expiration; (b) ordering Pappas to place all of his shares of Envirokare stock into the Voting Trust; and (c) precluding Pappas from serving as an officer of Envirokare.

4. For an award of damages, compensatory and punitive, including attorneys' fees, in favor of Envirokare and against Pappas.

5. Such further relief as the Court deems just and equitable.

## DEMAND FOR A JURY TRIAL

Envirokare demands a jury trial on all claims so triable.

Dated: New York, New York
   November 1, 2005

DORSEY & WHITNEY LLP

By: <u>s/ Zachary W. Carter</u>
   Zachary W. Carter (zc-0216)
250 Park Avenue
New York, NY
Tel.:  (212) 415-9200

Roger Magnuson *(pro hac vice)*
Thomas Jancik *(pro hac vice)*
Suite 1500, 50 South Sixth Street
Minneapolis, MN  55402-1498
Tel.:  (612) 340-2600

***Attorneys for Plaintiff Envirokare Tech, Inc.***

13