# INVESTMENT ADVISORY AGREEMENT

AGREEMENT, made this 7th day of August, 2003 between the undersigned party, Steve Pappas, whose mailing address is 44 87th Avenue, Brooklyn, NY 11209 (hereinafter referred to as the "**CLIENT**"), and MEDITRON ASSET MANAGEMENT, LLC, a registered investment adviser, whose principal mailing address is 280 Park Avenue, 39th Floor, West Building, New York, New York 10017 (hereinafter referred to as the "**ADVISER**").

1. Scope of Engagement.

   (a) The **CLIENT** hereby appoints the **ADVISER** as an Investment Adviser to perform the services hereinafter described, and the **ADVISER** accepts such appointment. The **ADVISER** shall be responsible for the investment and reinvestment of those assets designated by the **CLIENT** to be subject to the **ADVISER**'s management (which assets, together with all additions, substitutions and/or alterations thereto are hereinafter referred to as the "**Assets**" or "**Account**");

   (b) The **CLIENT** delegates to the **ADVISER** all of its powers with regard to the investment and reinvestment of the **Assets** and appoints the **ADVISER** as the **CLIENT**'s attorney and agent in fact with full authority to buy, sell, or otherwise effect investment transactions involving the **Assets** in the **CLIENT**'s name for the **Account**;

   (c) The **ADVISER** is authorized, without prior consultation with the **CLIENT**, to buy, sell, and trade in stocks, bonds, mutual funds, and other securities and/or contracts relating to the same, on margin (only if written authorization has been granted) or otherwise, and to give instructions in furtherance of such authority to the registered broker-dealer and the custodian of the **Assets**;

   (d) **CLIENT** authorizes **ADVISER** to respond to inquiries from, and communicate and share information with, **CLIENT**'s attorney, accountant and other professionals to the extent necessary in furtherance of **ADVISER**'s services under this **Agreement**;

   (e) The **CLIENT** agrees to provide information and/or documentation requested by **ADVISER** in furtherance of this **Agreement** as pertains to **CLIENT**'s objectives, needs and goals, and to keep **ADVISER** informed of any changes regarding same. The **CLIENT** acknowledges that **ADVISER** cannot adequately perform its services for the **CLIENT** unless the **CLIENT** diligently performs his responsibilities under this **Agreement**. **ADVISER** shall not be required to verify any information obtained from the **CLIENT**, **CLIENT**'s attorney, accountant or other professionals, and is expressly authorized to rely thereon;

   (f) The **CLIENT** acknowledges and understands that the services to be provided by **ADVISER** under this **Agreement** are limited to: (1) the management of the **Assets**; and, (2) ongoing financial planning and/or consultation services (**only** to the extent that the **CLIENT** had previously engaged the **ADVISER** to provide financial planning and/or related consultation services, **unless** otherwise determined by **ADVISER**) for the purpose of reviewing/evaluating/revising **ADVISER**'s previous recommendations and/or services relative to a change in the **CLIENT**'s financial situation and/or investment objectives. In the event that the **CLIENT** requires additional financial planning and/or consultation services, the **ADVISER** may determine to charge for such additional services, the dollar amount of which shall be set forth in a separate written notice to the **CLIENT**; and

   (g) Financial Planning Service(s). With respect to **ADVISER**'s financial planning and consulting services, the **CLIENT**: (i) is free at all times to accept or reject any recommendation from **ADVISER**, and the **CLIENT** acknowledges that he/she has the sole authority with regard to the implementation, acceptance, or rejection of any recommendation or advice from **ADVISER**; (ii) is free to obtain legal, accounting, and brokerage services from any professional source to implement the recommendations of **ADVISER**. **CLIENT** will retain absolute discretion over all implementation decisions; and (iii) maintains sole responsibility to notify the **ADVISER** if there is a change in his/her/their financial situation or investment objectives for the purpose of reviewing/evaluating/revising **ADVISER**'s previous recommendations and/or services.

2. Adviser Compensation.

(a) The **ADVISER's** annual fee for investment management services provided under this **Agreement** shall be a percentage (%) of the market value of the **Assets** under management in accordance with the fee schedule and made a part hereof as Schedule "A". This annual fee shall be prorated and paid quarterly, in advance, based upon the market value of the **Assets** on the last business day of the previous quarter. No increase in the annual fee shall be effective without prior written notification to the **CLIENT**;

(b) **CLIENT** authorizes the Custodian of the **Assets** to charge the **Account** for the amount of the **ADVISER's** fee and to remit such fee to the **ADVISER** in accordance with required SEC procedures;

(c) In addition to **ADVISER's** annual investment management fee, the **CLIENT** shall also incur, relative to all mutual fund purchases, charges imposed directly at the mutual fund level (e.g. advisory fees and other fund expenses); and

(d) No portion of *Adviser Compensation* shall be based on capital gains or capital appreciation of the **Assets** except as provided for under the Investment Advisers Act of 1940.

3. Custodian. The **Assets** shall be held by an independent custodian, not the **ADVISER**. The **ADVISER** is authorized to give instructions to the custodian with respect to all investment decisions regarding the **Assets** and the custodian is hereby authorized and directed to effect transactions, deliver securities, and otherwise take such actions as the **ADVISER** shall direct in connection with the performance of the **ADVISER's** obligations in respect of the **Assets**.

4. Execution of Brokerage Transactions (when applicable). If requested, **ADVISER** will arrange for the execution of securities brokerage transactions for the **Account** through broker-dealers that **ADVISER** reasonably believes will provide "best execution". In seeking best execution, the determinative factor is not the lowest possible commission cost but whether the transaction represents the best qualitative execution, taking into consideration the full range of a broker-dealer's services including the value of research provided, execution capability, commission rates, and responsiveness. Accordingly, although **ADVISER** will seek competitive commission rates, it may not necessarily obtain the lowest possible commission rates for **Account** transactions.

Consistent with obtaining best execution, transactions for the **Account** may be effected through broker-dealers in return for research products and/or services which assist **ADVISER** in its investment decision making process. Such research generally will be used to service all of **ADVISER's** clients (including accounts that may not generate commissions used to pay for investment research), but brokerage commissions paid by **CLIENT** may be used to pay for research that is not used in managing the **Account**. The **Account** may pay to a broker-dealer a commission greater than another qualified broker-dealer might charge to effect the same transaction where **ADVISER** determines in good faith that the commission is reasonable in relation to the value of the brokerage and research services received.

Transactions for each client account generally will be effected independently, unless **ADVISER** decides to purchase or sell the same securities for several clients at approximately the same time. **ADVISER** may (but is not obligated to) combine or "batch" such orders to obtain best execution, to negotiate more favorable commission rates or to allocate equitably among **ADVISER's** clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Under this procedure, transactions will be averaged as to price and will be allocated among **ADVISER's** clients in proportion to the purchase and sale orders placed for each client account on any given day. To the extent that the **ADVISER** determines to aggregate client orders for the purchase or sale of securities, including securities in which **ADVISER's** principal(s) and/or associated person(s) may invest, the **ADVISER** shall generally do so in accordance with the parameters set forth in SEC No-Action Letter, *SMC Capital, Inc.* The **ADVISER** shall not receive any additional compensation or remuneration as a result of the aggregation.

The **CLIENT** may direct **ADVISER** to use a particular broker-dealer to execute some or all transactions for the **Account** (subject to **ADVISER's** right to decline and/or terminate the engagement). In such event, the **CLIENT** will negotiate terms and arrangements for the **Account** with that broker-dealer, and **ADVISER** will not seek better execution services or prices from other broker-dealers or be able to "batch" **CLIENT** transactions for execution through other broker-dealers with orders for other accounts managed by **ADVISER**. As a result, **CLIENT** may pay higher commissions or other transaction costs or

greater spreads, or receive less favorable net prices, on transactions for the **Account** than would otherwise be the case. In the event that the transactions for the **Account** are effected through a broker-dealer that refers investment management clients to the **ADVISER**, the potential for conflict of interest may arise.

5. Account Transactions.
   (a) The **CLIENT** recognizes and agrees that in order for **ADVISER** to discharge its responsibilities, it must engage in securities brokerage transactions described in paragraph 1 herein;
   (b) Commissions and/or transaction fees are generally charged for effecting securities transactions;
   (c) In return for effecting securities brokerage transactions through certain broker-dealers, **ADVISER** may receive from those broker-dealers certain investment research products and/or services which assist **ADVISER** in its investment decision making process for the **CLIENT**, all of which transactions shall be in compliance with Section 28(e) of the Securities Exchange Act of 1934; and
   (d) The brokerage commissions and/or transaction fees charged to **CLIENT** for securities brokerage transactions are exclusive of, and in addition to, *Adviser Compensation* as defined in paragraph 2 hereof.

6. Risk Acknowledgment. **ADVISER** does not guarantee the future performance of the **Account** or any specific level of performance, the success of any investment recommendation or strategy that **ADVISER** may take or recommend for the **Account**, or the success of **ADVISER**'s overall management of the **Account**. **CLIENT** understands that investment recommendations for the **Account** by **ADVISER** are subject to various market, currency, economic, political and business risks, and that those investment decisions will not always be profitable.

7. Directions to the Adviser. All directions, instructions and/or notices from the **CLIENT** to the **ADVISER** shall be in writing, including notification of a change in the **CLIENT**'s investment objective(s). The **ADVISER** shall be fully protected in relying upon any direction, notice, or instruction until it has been duly advised in writing of changes therein.

8. Adviser Liability. Except as otherwise provided by federal or state securities laws, the **ADVISER**, acting in good faith, shall not be liable for any action, omission, investment recommendation/decision, or loss in connection with this **Agreement** including, but not limited to, the investment of the **Assets**, or the acts and/or omissions of other professionals or third party service providers recommended to the **CLIENT** by the **ADVISER**, including a broker-dealer and/or custodian. If the **Account** contains only a portion of the **CLIENT**'s total assets, **ADVISER** shall only be responsible for those assets that the **CLIENT** has designated to be the subject of the **ADVISER**'s investment management services under this **Agreement** without consideration to those additional assets not so designated by the **CLIENT**.

9. Proxies. The **ADVISER** (unless the **CLIENT** directs otherwise in writing) shall be responsible for: (1) directing the manner in which proxies solicited by issuers of securities beneficially owned by the **CLIENT** shall be voted, and (2) making all elections relative to any mergers, acquisitions, tender offers, bankruptcy proceedings or other type events pertaining to the **Assets**. **ADVISER** is authorized to instruct the Custodian to forward to the **ADVISER** copies of all proxies and shareholder communications relating to the **Assets**.

10. Reports. The **ADVISER** and/or **Account** custodian shall provide the **CLIENT** with periodic reports for the **Account**.

11. Termination. This **Agreement** will continue in effect until terminated by either party by written notice to the other (**email notice will not suffice**), which written notice must be signed by the terminating party. Termination of this **Agreement** will not affect (i) the validity of any action previously taken by **ADVISER** under this **Agreement**; (ii) liabilities or obligations of the parties from transactions initiated before termination of this **Agreement**; or (iii) **CLIENT**'s obligation to pay advisory fees (prorated through the date of termination). Upon the termination of this **Agreement**, **ADVISER** will have no obligation to recommend or take any action with regard to the securities, cash or other investments in the **Account**.

12. Assignment. This **Agreement** may not be assigned (within the meaning of the Investment Advisers Act of 1940) by either the **CLIENT** or the **ADVISER** without the prior written consent of the other party. The **CLIENT** acknowledges and agrees that transactions that do not result in a change of actual control or management of the **ADVISER** shall not be considered an assignment pursuant to Rule 202(a)(1)-1 under the Investment Advisers Act of 1940.

13. Non-Exclusive Management. **ADVISER**, its officers, employees, and agents, may have or take the same or similar positions in specific investments for their own accounts, or for the accounts of other clients, as the **ADVISER** does for the **Assets**. **CLIENT** expressly acknowledges and understands that **ADVISER** shall be free to render investment advice to others and that **ADVISER** does not make its investment management services available exclusively to **CLIENT**. Nothing in this **Agreement** shall impose upon the **ADVISER** any obligation to purchase or sell, or to recommend for purchase or sale, for the **Account** any security which the **ADVISER**, its principals, affiliates or employees, may purchase or sell for their own accounts or for the account of any other client, if in the reasonable opinion of the **ADVISER** such investment would be unsuitable for the **Account** or if the **ADVISER** determines in the best interest of the **Account** it would be impractical or undesirable.

14. Death or Disability. The death, disability or incompetency of **CLIENT** will not terminate or change the terms of this **Agreement**. However, **CLIENT**'s executor, guardian, attorney-in-fact or other authorized representative may terminate this **Agreement** by giving written notice to **ADVISER**. The **CLIENT** recognizes that the custodian may not permit any further **Account** transactions until such time as any documentation required is provided by the custodian.

15. Arbitration. Subject to the conditions and exceptions noted below, and to the extent not inconsistent with applicable law, in the event of any dispute pertaining to **ADVISER**'s services under this **Agreement** cannot be resolved by mediation, both **ADVISER** and **CLIENT** agree to submit the dispute to arbitration in accordance with the auspices and rules of the American Arbitration Association ("AAA"), provided that the AAA accepts jurisdiction. **ADVISER and CLIENT understand that such arbitration shall be final and binding, and that by agreeing to arbitration, both ADVISER and CLIENT are waiving their respective rights to seek remedies in court, including the right to a jury trial.** **CLIENT** acknowledges that **CLIENT** has had a reasonable opportunity to review and consider this arbitration provision prior to the execution of this **Agreement**. **CLIENT** acknowledges and agrees that in the specific event of non-payment of any portion of Adviser Compensation pursuant to paragraph 2 of this **Agreement**, **ADVISER**, in addition to the aforementioned arbitration remedy, shall be free to pursue all other legal remedies available to it under law, and shall be entitled to reimbursement of reasonable attorneys fees and other costs of collection.

16. Disclosure Statement. The **CLIENT** hereby acknowledges prior receipt of a copy of the Disclosure Statement of the **ADVISER** as same is set forth on Part II of Form ADV (Uniform Application for Investment Adviser Registration). **CLIENT** further acknowledges that **CLIENT** has had a reasonable opportunity (i.e. at least 48 hours) to review said Disclosure Statement, and to discuss the contents of same with professionals of his choosing, prior to the execution of this **Agreement**. If the **CLIENT** has not received a copy of the **ADVISER**'s Disclosure Statement at least 48 hours prior to execution of this **Agreement**, the **CLIENT** shall have 5 business days from the date of execution of this **Agreement** to terminate **ADVISER**'s services without penalty.

17. Severability. Any term or provision of this **Agreement** which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of this **Agreement** or affecting the validity or enforceability of any of the terms or provisions of this **Agreement** in any other jurisdiction.

18. Client Conflicts. If this **Agreement** is between the **ADVISER** and related clients (i.e. husband and wife, life partners, etc.), **ADVISER**'s services shall be based upon the joint goals communicated to the **ADVISER**. **ADVISER** shall be permitted to rely upon instructions from either party with respect to

disposition of the **Assets**, unless and until such reliance is revoked in writing to the **ADVISER**. The **ADVISER** shall not be responsible for any claims or damages resulting from such reliance or from any change in the status of the relationship between the clients.

19. Privacy Notice. The **CLIENT** acknowledges prior receipt of the **ADVISER**'s *Privacy Notice.*

20. Entire Agreement/Applicable Law. This **Agreement** supersedes and replaces, in its entirety, all previous investment advisory agreement(s) between the parties. To the extent not inconsistent with applicable law, this **Agreement** shall be governed by and construed in accordance with the laws of the State of New York. In addition, to the extent not inconsistent with applicable law, the venue (i.e. location) for the resolution of any dispute or controversy between **ADVISER** and **CLIENT** shall be the City of New York, State of New York.

21. Referral Fees. If the **CLIENT** was introduced to the **ADVISER** through a **Solicitor**, the **ADVISER** may pay that **Solicitor** a referral fee in accordance with Rule 206(4)-3 of the Investment Advisers Act of 1940. The referral fee shall be paid solely from Adviser Compensation as defined in this **Agreement**, and shall not result in any additional charge to the **CLIENT**. The **CLIENT** acknowledges receipt of the written disclosure statement disclosing the terms of the solicitation arrangement between the **ADVISER** and the **Solicitor**, including the compensation to be received by the **Solicitor** from the **ADVISER**.

22. Authority. The **CLIENT** acknowledges that he/she/they/it has (have) all requisite legal authority to execute this **Agreement**, and that there are no encumbrances on the **Assets**. The **CLIENT** correspondingly agrees to immediately notify the **ADVISER**, in writing, in the event that either of these representations should change.

IN WITNESS WHEREOF, the **CLIENT** and **ADVISER** have each executed this **Agreement** on the day, month and year first above written.

_____, Client

MEDITRON ASSET MANAGEMENT, LLC

By:_____
Walter V. Gerasimowicz, Chairman & CEO

## Schedule A

The assets which shall be managed under the Agreement are s follows:

Certain financial holdings of: Steve Pappas as per Trust Agreement:
Approximately $2,500,000 (Two-Million-Five-Hundred-Thousand U.S. dollars).

- The **ADVISER's** annual fee for investment management services provided under this **Agreement** shall be a percentage of the market value of the **Assets** under management as shown below. This annual fee shall be prorated and paid quarterly, in advance, based upon the market value of the **Assets** on the last business day of the previous quarter ending March 31st, June 30th, September 30th and December 31st. No increase in the annual fee shall be effective without prior written notification to the **CLIENT**.

<u>Equity and Balanced Accounts</u>

1%    per annum of the first $10 million
¾ of 1% per annum of the next $10 million
½ of 1% per annum of the next $10 million
negotiable thereafter

(a)   Upon termination of this Agreement, if other than on a Fee Calculation Date, Meditron Asset Management , LLC shall be entitled to charge a proportionate part of the fee for the period from the immediately preceding Fee Calculation Date to and including the date of termination.

(b)   The fee shall be payable to Meditron Asset Management, LLC following receipt by the **CLIENT** or **CLIENT'S** custodian of the Adviser's invoice. If not paid by separate check, **CLIENT** agrees that the fees will be automatically deducted from one of the **CLIENT'S** accounts and wire transferred in accordance with instructions provided by the **ADVISER**.